# EXHIBIT 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

William Benner, Vote Bill Benner  :
Committee, Nichole Missino, and  :
d/b/a Giovanni's Media Barber,  :  20-cv-775
Kraig Nace, Detailed Attention, Inc., :
John Williams, Stephen Cassel,  :
Iacobucci Formal Wear,   :  Hon. John E. Jones III
         :
  Petitioners-Plaintiffs  :
         :
v.         :
         :
Thomas W. Wolf, in his official  :
Capacity as Governor of the  :
Commonwealth of Pennsylvania, :
Rachel Levine, MD, in her official :
capacity as Secretary,   :
Pennsylvania Department of Health :
Dennis M. David, Secretary,  :
Pennsylvania Department of  :
Community and Economic  :
Development    :
         :
  Respondents-Defendants. :

## ORDER

**May 21, 2020**

Presently pending before the Court is Petitioners' Motion for a Temporary

Restraining Order, ("the Motion"), filed by Petitioners William Benner, Vote Bill

Benner Committee, Nichole Missino d/b/a Giovanni's Media Barber, Kraig Nace,

Detailed Attention, Inc., John Williams, Stephen Cassel, and Iacobucci Formal

Wear (collectively, "Petitioners"). (Doc. 3). Defendants are Thomas Wolf, Governor of Pennsylvania, Dr. Rachel Levine, Pennsylvania Secretary of Health, and Dennis David, Pennsylvania Secretary of Community and Economic Development, (collectively, "Respondents"). The Motion has been briefed by the parties. (Docs. 4; 13). Thus, the matter is ripe for our review. For the reasons that follow, the temporary restraining order shall be denied.

## I.   FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Approximately two months ago, Governor Wolf declared a disaster emergency in the Commonwealth of Pennsylvania due to the rapid global spread of the deadly COVID-19 virus. (Doc. 3 at 5). Over the following weeks, the Governor announced three unprecedented Executive Orders which drastically altered everyday life in the Commonwealth: the Business Closure Order, the Stay-at-Home Order, and the School Closure Order, (collectively, "the Orders"). (*Id.* at 5-7). Those orders temporarily closed non-essential businesses, ordered individuals to remain at home when not completing essential tasks, and made virtual learning the norm for schoolchildren. (*Id.*). These orders remain largely in effect to slow the spread of COVID-19, a disease that has, as of the date of this writing, killed over

4,767 people in Pennsylvania alone.[1] Petitioners now bring a variety of

constitutional and state law claims challenging the implementation of the Orders.

### A. Business Closure Order and Waiver System

On March 19, 2020, the Governor issued the Business Closure Order, which

barred the operation of business in Pennsylvania that were not "life sustaining."

(Doc. 4 at 5). "Life sustaining" business were permitted to remain open, provided

that they implemented social distancing procedures and other precautions. (*Id.*).

Accompanying the Business Closure Order was a list classifying businesses and

industries as either "life sustaining" or "non-life sustaining." (*Id.*). All Petitioners

own and operate business that were classified as "non-life sustaining," and were

thus forced to cease operations. (*Id.* at 5-6). Violation of the order could result in

citations, fines, license suspensions, and the forfeiture of disaster relief. (*Id.* at 5-6).

After issuing the Business Closure Order, the Governor instituted a "waiver"

process by which "non-life sustaining" business could submit an application to the

Department of Community and Economic Development, ("DCED"), requesting

permission to continue operations during the pandemic. (*Id.* at 6). In total, DCED

received 42,380 waiver requests. Thus far, DCED has approved 7,837 requests,

rejected 18,746 requests, and found that 14,471 did not require a waiver to

---

[1]     *Coronavirus (COVID-19): Pennsylvania Overview,* PENNSYLVANIA DEPARTMENT OF
HEALTH, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed May
21, 2020).

continue operations in the manner requested. (*Id.*). The remainder of the waiver

requests are still being processed. (*Id.*). DCED stopped taking new applications on

April 3, 2020. (*Id.*). Several Petitioners applied for waivers and were denied,

namely two real estate agents. (*Id.*at 7). There was no method provided for

administrative review of the waiver process, judicial or otherwise. (*Id.*)

### B. School Closure Order

On March 13, 2020, the Governor issued an order closing all schools in the

Commonwealth, both public and private. (*Id.*). The School Closure Order was later

extended through the remainder of the 2019-2020 school year. (*Id.*).

### C. Stay-at-Home Order

On March 23, 2020, the Governor issued the Stay-at-Home Order, which

required Pennsylvanians in certain hard-hit counties to remain home unless

performing life-sustaining business or for the completion of other essential tasks.[2]

On April 1, 2020, the Governor expanded that order to cover the entire state. (Doc.

4 at 7). On that same day, Secretary Levine issued a similar order. (*Id.*). The Stay-

at-Home Order prohibits large gatherings outside the home, except as is required to

sustain life. (*Id.*).

---

[2]     *Governor Wolf and Health Secretary Issue 'Stay at Home' Orders to 7 Counties to Mitigate Spread of COVID-19*, WEBSITE OF THE GOVERNOR OF PENNSYLVANIA, https://www.governor.pa.gov/newsroom/governor-wolf-and-health-secretary-issue-stay-at-home-orders-to-7-counties-to-mitigate-spread-of-covid-19/ (last accessed May 21, 2020).

### D. Reopening the State

On May 1, 2020 the Governor announced that he would begin "reopening" the state on a county-by-county basis. (*Id.* at 8). In so doing, Governor Wolf announced that he would utilize a phased system: counties would be classified as Red, Yellow, or Green depending on a variety of factors.[3] Counties that met certain benchmarks were allowed to move from the Red Phase of the Stay-at-Home and Business Closure Orders to the less restrictive Yellow Phase, which allowed for retail and childcare services to resume.[4] Telework is still encouraged in the Yellow Phase, and services such as gyms and salons are required to remain closed. *Id.* The Stay-at-Home Order is lifted under the Yellow Phase, but gatherings of more than 25 people are still prohibited. *Id.* Under the Green Phase, normal life could resume. No county has yet been moved to the Green Phase. *Id.*

The decision to move a county from the Red Phase to the Yellow Phase is based upon the number of positive cases per 100,000 people remaining at 50 or below for 14 consecutive days. *Id.* A county also needs to show that there is enough testing available for high-risk and symptomatic individuals and that they have in place a robust contact tracing system. *Id.*

---

[3]     *Gov. Wolf Announces Reopening of 24 Counties Beginning May 8*, WEBSITE OF THE GOVERNOR OF PENNSYLVANIA, https://www.governor.pa.gov/newsroom/gov-wolf-announces-reopening-of-24-counties-beginning-may-8/ (last accessed May 21, 2020).

[4]     *Process to Reopen Pennsylvania*, WEBSITE OF THE GOVERNOR OF PENNSYLVANIA, https://www.governor.pa.gov/process-to-reopen-pennsylvania/ (last accessed May 21, 2020).

In the first round of "reopenings" on May 1, 2020, the Governor moved many counties in the northwest and northcentral regions of the state to the Yellow Phase.[5] On May 8, the Governor moved additional counties in the western part of the state to the Yellow Phase. (Doc. 4 at 9). As of now, counties in the southcentral and south eastern portions of the state remain largely in the Red Phase. (*Id.*). All Petitioners live and work in counties still operating under the Red Phase of the Governor's plan. (*Id.*).[6] The Governor has retained the ability to move a county backwards in his phased system (ie from Yellow back to Red) should the need arise. (*Id.*).

### E. Effect on Petitioners

Petitioners are business owners, real estate agents, and political candidates who live and work in Perry and Delaware counties, both of which are currently in the Red Phase. They now bring the instant case alleging that the Orders infringe upon various constitutional rights and ask us to enjoin their enforcement.[7] The

---

[5]     *Gov. Wolf Announces Reopening of 24 Counties Beginning May 8*, WEBSITE OF THE GOVERNOR OF PENNSYLVANIA, https://www.governor.pa.gov/newsroom/gov-wolf-announces-reopening-of-24-counties-beginning-may-8/ (last accessed May 20, 2020).

[6]     On Friday May 15, the Governor announced that Perry County, where several Petitioners reside, and 11 other counties would move to the Yellow Phase on May 22, 2020.

[7]     Petitioners allege nine counts in their complaint: Procedural Due Process (Count I); Substantive Due Process (Count II); Unjust Taking (Count III); Payment for Use of Petitioners' Property (Count IV—state law claim); Equal Protection (Count V); First Amendment violations (Count VI); the Guarantee Clause (Count VII); Freedom of Religion (Count VIII); Right to Public Education (Count IX).

instant Motion seeks a temporary restraining order premised upon their procedural due process (Count I) and First Amendment (Count VI) claims.[8]

## II.   LEGAL STANDARD

Courts apply one standard when considering whether to issue interim injunctive relief, regardless of whether a petitioner requests a temporary restraining order ("TRO") or preliminary injunction. *See Ellakkany v. Common Pleas Court of Montgomery Cnty.*, 658 Fed.Appx. 25, 27 (3d Cir. July 27, 2016) (applying one standard to a motion for both a TRO and preliminary injunction). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Apple Inc. v. Samsung Electronics Co.*, 695 F.3d 1370, 1373–74 (Fed. Cir. 2012) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365 (2008)). The Supreme Court has emphasized that "a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997); *Apotex Inc. v. U.S. Food and Drug Admin.*, 508 F.Supp.2d 78, 82 (D.D.C. 2007) ("Because interim injunctive relief is

---

[8]   During oral argument, Petitioners' counsel confirmed that the Motion sought relief only on the procedural due process and First Amendment claims.

an extraordinary form of judicial relief, courts should grant such relief sparingly.").
"Awarding preliminary relief, therefore, is only appropriate 'upon a clear showing
that the plaintiff is entitled to such relief.'" *Groupe SEC USA, Inc. v. Euro–Pro
Operating LLC*, 774 F.3d 192, 197 (3d Cir. 2014) (quoting *Winter*, 555 U.S. at 22).

### III.  DISCUSSION

The issue currently before us is not unique to Pennsylvania and has largely
divided our nation into two camps: one which believes that mitigation measures
are still necessary to slow the spread of COVID-19 and another that asserts those
same strategies are causing more economic harm than medical good. In the face of
overcrowded hospitals, high death counts, staggering unemployment statistics, and
long food lines, there are no straightforward solutions. Stress levels are high, and
tempers boiling over. It is only natural for citizens to want to resume their normal
lives—to earn paychecks again and to visit family and friends—just as it is
reasonable to fear that a future viral outbreak could endanger those same loved
ones. Reasonable people will differ on the best way forward in such uncertain
times. Our task, however, is not to evaluate the merits of these positions through
the lens of popular opinion. Instead, we must consider the constitutionality of the
Governor's Orders and determine whether there are sufficient legal and factual
bases for Respondents' actions. For the reasons that follow, we find that there are.

## A. Likelihood of Success on the Merits

### i. Procedural Due Process

Petitioners argue that they were denied "the right to notice, a hearing and judicial review, among many other forms of due process, prior to and after the issuance of the Orders." (Doc. 4 at 10). In so arguing, Petitioners make thee distinct claims: (1) a pre-deprivation notice and opportunity to be heard was necessary before closing Petitioners' businesses and confining them to their homes; (2) if a pre-deprivation process was not required, the Governor's waiver process does not constitute adequate post-deprivation due process; and (3) the Governor exceeded the scope of permissible police power by issuing the Orders. We take each argument in turn.

### a.    Pre-deprivation Process

It is undeniable that "procedural due process is required even in times of emergency." *Friends of Danny DeVito v. Wolf*, No. 68 MM 2020, 2020 WL 1847100, at *20 (Pa. Apr. 13, 2020) (citing *Bell v. Burson*, 402 U.S. 535, 542, 91 S.Ct. 1586, 1586, 29 L.Ed 90 (1971). However, procedural due process is "not a technical conception with a fixed content unrelated to time, place, and circumstance." *Gilbert v. Homar*, 520 U.S. 924, 930 117 S.Ct. 1807, 138 L.Ed.2d 120 (1997). We therefore consider the attendant circumstances in determining whether a pre-deprivation notice and opportunity to be heard was necessary.

Petitioners cite several Supreme Court cases which hold that a pre-deprivation process was required, none of which are applicable here. (Doc. 4 at 11-12). Petitioners' proffered authority generally address *permanent* deprivations of property rights, while the Orders are explicitly temporary in nature.

Furthermore, the nature of the COVID-19 emergency justifies the lack of pre-deprivation process. Indeed, one of Petitioners' cited cases, *Hodel v. Va. Surface Mining & Reclamation Ass'n*, explicitly holds that "[p]rotection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action. . .deprivation of property to protect the public health and safety is "[o]ne of the oldest examples" of permissible summary action." 452 U.S. 264, 300, 101 S. Ct. 2352, 2373, 69 L. Ed. 2d 1 (1981) (citing *Ewing v. Mytinger & Casselberry, Inc., supra*, 339 U.S., 594, 599, 70 S.Ct., 870, 872, 94 L.Ed. 1088 (1950)). Moreover, when "the administrative action provided through immediate cessation orders responds to situations in which swift action is necessary to protect the public health and safety[. . .] [t]his is precisely the type of emergency situation in which this Court has found summary administrative action justified." *Id*. ‼

In addition, "''the necessity of quick action by the State or the impracticality of providing any pre-deprivation process' may mean that a post-deprivation remedy is constitutionally adequate." *Logan v. Zimmerman Brush Co.*, 455 U.S.

422, 436, 102 S.Ct. 1148, 71 L.Ed.2d 265 (1982). The circumstances presently

before us thus justify the use of post-deprivation process on the basis of public

health and safety. At the time the Orders were issued, it is beyond dispute that

COVID-19 was rapidly spreading across the globe. The virus was known to be

highly contagious, and public health experts the world over proclaimed that social

distancing was the only effective way to combat its deadly effects. Quick action in

the face of such facts was not only justified, but required. There was no

opportunity to provide individualized pre-deprivation process to *every business

and individual* in the Commonwealth prior to the issuance of the Orders. Doing so

would have rendered ineffective any public health measures meant to combat viral

spread. The circumstances surrounding COVID-19 justified the Governor's quick

action and negated the necessity of pre-deprivation due process. Petitioners are

therefore unlikely to succeed on the merits of this argument.

### b.    Post-deprivation Process

It is axiomatic that procedural due process protections do not completely

disappear in times of trial and hardship. ("The Supreme Court has held that at all

times, even when the country is at war, essential liberties remain in

effect." *Friends of Danny DeVito*, No. 68 MM 2020, 2020 WL 1847100, at *19

(citing *Bell* 402 U.S. at 542, 91 S.Ct. 1586)). We thus consider whether adequate

post-deprivation due process exists here. Petitioners argue that the waiver process

is not sufficient to satisfy due process because it does not include judicial review.[9]

(Doc. 4 at 12).[10]

To determine whether Respondents' post-deprivation due process procedures were adequate, we look to the balancing approach dictated in *Matthews v. Eldridge*, which examines three factors: (1) the private interest affected by the governmental action; (2) the risk of an erroneous deprivation together with the value of additional or substitute safeguards; and (3) the state interest involved, including the administrative burden the additional or substitute procedural requirements would impose on the state. *Mathews v. Eldridge*, 424 U.S. 319, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

As discussed previously, the Supreme Court has held that a lower standard of procedural due process may be adequate in times of emergency. *See Bell*, 402

---

[9]      Petitioners' claim that *only* judicial review would render an adequate post-deprivation process falls short. Petitioners provide no support for this contention, and we thus shall read no such rigid requirement into the flexible, fact-based procedural due process standard.

[10]     Petitioners also claim there are grave procedural due process concerns regarding the Stay-at-Home Order.  In their brief, however, they offer but one sentence describing the constitutional infirmities of this system: "Respondents provided no waiver process, and thus no due process of any form, to the Movants and millions of Pennsylvanians subject to their Stay-At-Home Order. (Doc. 4 at 12).  During oral argument, Petitioners' counsel raised this issue again but voiced general concerns regarding the appropriateness of the order and the purported lack of recourse.  Without more of a showing as to the three-factor procedural due process standard, we cannot declare Governor Wolf's Stay-at-Home order violative of due process. Indeed, Petitioners have not performed any balancing of the government interest or the effect on the public, nor have they discussed the potential harms they face as a result. Further, we note that Petitioners' opposition with the order appears to center around their disagreement with the order as a policy matter, not a constitutional one.

U.S. at 542, 91 S.Ct. 1586 ("[p]rotection of the health and safety of the public is a paramount governmental interest which justifies summary administrative action. Indeed, deprivation of property to protect the public health and safety is '[o]ne of the oldest examples' of permissible summary action").

In that vein, the government interest in preventing the spread of a highly contagious and deadly infectious disease is a substantial one. At the time the Orders were issued, Pennsylvania faced a very real threat that the Commonwealth's hospitals would become overrun with COVID-19 patients, forcing doctors to make impossible choices about who would receive life-saving care. Indeed, the grim death rates being reported the world over justified quick and summary action to prevent the spread of COVID-19.

In the face of such dire circumstances and considering the "emergency exception" espoused by the Supreme Court, we find that the waiver process is an adequate summary procedure by which business owners may contest their placement on the non-life sustaining list. By completing an application explaining their business in more detail for subsequent review, business owners are providing further information by which the decision to shutter their business can be reexamined. Requiring greater procedures in the present circumstances would place substantial burdens upon the government in the age of telework and social distancing, and we are not convinced, nor have Petitioners shown, that doing so

13

would provide "additional value" to the process.[11] Indeed, requiring more detailed procedures could very well overwhelm an already taxed system and result in fewer business receiving review. To be sure, it is evident that administration of the waiver process has been uneven, which has triggered enormous discontent among business owners such as Petitioners. But procedural due process need not reach perfection and must only achieve adequacy. As noted, we have been presented with no evidence that the waiver process is less than adequate due process. Petitioners have thus failed to show that the waiver system is an insufficient provision of due process under the present circumstances.

### c.   Police Powers

Finally, Petitioners argue that the Governor has exceeded the permissible scope of his police powers by issuing the Orders. Petitioners contend that the Orders "do more harm than good" and that "the closure of [Petitioners'] physical operations and the prohibition on them leaving their homes. . .is not reasonable considering the actual evidence shows these lockdowns have been a failure." (Doc 4 at 15-16). Respondents disagree, contending that states have "broad" police powers, and that "the protection of public health, safety, and welfare falls within the traditional scope of a State's police powers." (Doc. 13 at 18).

---

[11]     We also consider the temporary nature of the Business Closure Order. The counties in which several Petitioners reside will begin to partially reopen on May 22, 2020, thereby also significantly lessening any "additional value" burdensome safeguards may provide over the next few days, weeks, and months.

The Supreme Court has previously considered the extent of a state's police powers in a case similar to the circumstances presently before us. In *Jacobson v. Massachusetts*, Plaintiff contested a state law which required all citizens to be vaccinated against smallpox after an outbreak. 197 U.S. 11 (1905). In upholding the law, the Court held that "the liberty secured by the Constitution . . . does not import an absolute right in each person to be, at all times and in all circumstances, wholly freed from restraint." *Id*. at 26. As a result, we consider two factors to determine to if a "restraint" exceeds the proper bounds of police power: (1) whether the interests of the public require government interference; and (2) whether the means used are reasonably necessary to accomplish that purpose and not unduly oppressive upon individuals. *Lawton v. Steele*, 152 U.S. 133, 137 (1894).

To reiterate, Petitioners maintain that the first factor of the *Lawton* test is not satisfied because the Orders "do more harm than good." They cite several experts for the proposition that the lockdown measures were a "huge mistake," but provide no further support for their position. (Doc. 4 at 15). However, as we have previously discussed, preventing the spread of infectious disease is a substantial government interest which requires quick action from state officials. Indeed, Petitioners indicate that they agree some measure of interference was required—

they merely disagree with the type of interference that ultimately resulted.[12] We

thus conclude that government interference was required to stem the tide of the

COVID-19 public health crisis, and next consider whether the means employed by

the Governor were "reasonably necessary" or "unduly burdensome."

Petitioners argue that the Orders were not reasonably necessary because "the

actual evidence shows these lockdowns have been a failure." (Doc. 4 at 15-16).

Notably, however, Petitioners provide no support whatsoever for this broad

assertion. They further assert that "a reasonable means would have been for the

Respondents to have required businesses and entities to employ COVID-19

precautions like they have done in the government offices. . .and entities they

deemed to be life-sustaining or to whom they have granted waivers and thus

permitted to remain open." (*Id.* at 16). Again, Petitioners provide us no evidence to

support this claim, which smacks of opposition based upon a disagreement with the

Governor's policy decisions. Indeed, when pressed on this point during oral

argument, Petitioners admitted that their objections to the Orders were grounded in

policy concerns, not constitutional ones, as evinced by the following exchange:

> THE COURT: I think people are clearly beside themselves in
> many sectors of Pennsylvania. They want it to end. They're
> tense. They have great anxiety. Some are afraid that they'll get
> the disease. Some are just upset . . . [at] these restrictions of

---

[12]    Petitioners provided us with an article praising the COVID-19 response in Sweden,
which instituted "moderate social distancing."

everything that we know as citizens of the United States. But does that make it unconstitutional?

MR. SCARINGI: The deprivation of their rights to liberty and property, yes. My clients --

THE COURT: Per se? Per se it's unconstitutional? Aren't you writing out the police powers of a Governor under emergency situations? You're saying he called it wrong, right?

MR. SCARINGI: Absolutely, yes.

THE COURT: All right. And he called it -- so he made a bad policy decision?

MR. SCARINGI: Right.

THE COURT: Is it the function of a court of law, in this case a federal court, to alter a Governor's policy decision simply because we disagree with it?

MR. SCARINGI: Absolutely.

Consequently, Petitioners provide us no basis upon which we could find that the Orders were not reasonably necessary to combat COVID-19 beyond their broad, unsubstantiated assertions and political disagreements. These are not appropriate bases for enjoining the Orders. *Goldblatt v. Town of Hempstead, N.Y.*, 369 U.S. 590, 594-95 (1962). While Pennsylvania's economy has surely been affected by the Governor's actions, Petitioners provide no support for their contentions that the Orders were not necessary to slow the spread of COVID-19, nor that they were an

unreasonable reaction to the global pandemic. Their *Lawton* police power

argument is thus also unlikely to succeed.[13]

### ii. First Amendment

Petitioners contend that their First Amendment rights have been unlawfully

restricted by the Orders because they are unable to leave their homes and cannot

gather in large groups. (Doc. 4 at 20). These rights, they argue, will continue to be

impacted in the Yellow Phase because large gatherings will still be prohibited.

(*Id.*). Respondents disagree, contending that the Orders do not regulate speech

because alternative avenues of communication and assembly continue to exist and

that, even if speech is regulated, it is content-neutral. (Doc. 13 at 31-32). We agree

and thus find Petitioners' First Amendment claim unlikely to succeed on the

merits.

Constitutional rights to free speech and assembly are not absolute. Content-

neutral "time, place, and manner" regulations are permitted "so long as they are

designed to serve a substantial governmental interest and do not unreasonably limit

alternative avenues of communication." *City of Renton v. Playtime Theatres, Inc.*,

475 U.S. 41, 46-47, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986); *Grace United Methodist*

---

[13]     Petitioners also maintain that the Orders are an "arbitrary interference" and impose
"unusual and unnecessary restrictions" upon them. (Doc. 14 at 17-19). The Orders are certainly
"unusual." But so too are the circumstances which caused them. Petitioners again appear to be
voicing their disagreement with the Governor's actions without providing any support for their
broad, hyperbolic contentions.

*Church v. City of Cheyenne*, 451 F.3d 643, 658 (10th Cir. 2006) (the right of assembly and expressive association are " 'no more absolute than the right of free speech or any other right; consequently there may be countervailing principles that prevail over the right of association' ") (quoting *Walker v. City of Kansas City*, 911 F.2d 80, 89 n. 11 (8th Cir. 1990)). "The principal inquiry in determining content neutrality ... is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989).

The Pennsylvania Supreme Court has recently held that "[t]here is no question that the containment and suppression of COVID-19 and the sickness and death it causes is a substantial governmental interest*." Friends of Danny DeVito*, No. 68 MM 2020, 2020 WL 1847100, at *24. We agree. Protecting lives is among the most substantial of government interests, and we see no indication whatsoever that the Orders are content-based. They apply equally to all citizens of Pennsylvania and to a great number of non-life sustaining businesses, "regardless of message." *Id.*

We therefore ask whether reasonable "alternative avenues" are still available to Pennsylvanians to express themselves. The Pennsylvania Supreme Court is again instructive: the Orders do "not in any respect limit the ability to speak or assemble, however, as [they do] not in any respect prohibit operations by

19

telephone, video-conferencing, or on-line through websites and otherwise. In this era, cyberspace in general and social media in particular have become the lifeblood for the exercise of First Amendment rights." *Id. (citing Packingham v. North Carolina*, —— U.S. ——, 137 S.Ct. 1730, 1735, 198 L.Ed.2d 273 (2017). Further, as Respondents note, "the Governor's Orders do not limit political candidates and their supporters from speaking on television and radio; the Orders do not prevent any campaign from sending out direct mailings; the Orders do prohibit putting up yard signs; and, the Orders do not stop anyone from speaking to the press." (Doc. 13 at 32-33). Indeed, protesting is also not curtailed, even when social distancing protocols are not adhered to.[14] We thus find that, even if the Orders do regulate speech, they provide "alternative avenues" of expression that prove fatal to Petitioners' claim.

### B.    Irreparable Harm

To succeed on their Motion, Petitioners "must demonstrate. . .the probability of irreparable harm if relief is not granted." *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100, 102 (3d Cir. 1988) (internal quotations omitted). "In order to demonstrate irreparable harm the plaintiff must demonstrate potential harm which cannot be redressed by a legal or an equitable remedy

---

[14]    *See* Steven Marroni, et al., "Protest of Gov. Wolf's coronavirus shutdown at Capitol: Recap," PennLive.com, https://www.pennlive.com/news/8d1601-protest-of-gov-wolf-s-coronavirusshutdown-at-capitol-live-updates.html (last accessed May 19, 2020) (reporting on the April 20, 2020 rally).

following a trial". . .the temporary restraining order. . ."must be the only way of protecting the plaintiff from harm." *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 801 (3d Cir. 1989). Here, Petitioners maintain that they will suffer two forms of irreparable harm should we deny the Motion: (1) *per se* harm from the loss of First Amendment rights; and (2) substantial business losses. (Doc. 4 at 21-22).[15]

"The assertion of First Amendment rights does not automatically require a finding of irreparable injury, thus entitling a plaintiff to a preliminary injunction if he shows a likelihood of success on the merits." *Hohe v. Casey*, 868 F.2d 69, 73 (3d. Cir. 1989). "Rather the plaintiff[s] must show "a effect on free expression." *Id.* at 73 (citing *Dombrowski v. Pfister*, 380 U.S. 479, 487 (1965)). We see no evidence of a chilling effect on free speech here. As discussed, Pennsylvanians are permitted to fully express their opinions on the Internet, through the mails, and in public protests. We thus see no likely irreparable injury resulting from Respondents' alleged First Amendment violations.

Petitioners also cannot demonstrate a likelihood of irreparable harm based upon their business losses. Petitioners present declarations outlining their estimated

---

[15]    Petitioner Williams also argues that his two school-age children have faced irreparable harm from their First Amendment right to the free exercise of religion due to the closure of their Catholic school. (Doc. 4 at 21-22). However, Petitioners did provide any support on the likelihood of Petitioner Williams's success on the merits of this claim, nor have they provided declarations, reports, or any other substantiation of harm. We are thus unable to grant Petitioner Williams's claim, even assuming it was properly raised in the Motion.

losses due to the Orders based upon prior earnings to support this claim. However, economic harms are generally insufficient to show irreparable harm in the context of such extraordinary emergency relief. *ECRI v. McGrawHill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987). While we recognize that Petitioners' losses are not insignificant and are sympathetic to their claims, they are exclusively financial and largely hypothetical at this juncture. This fact, combined with the low likelihood of success on the merits of their claims, shows that Petitioners have failed to carry their burden of showing irreparable harm at this time.

## C.   Balancing of the Equities and Public Interest

Petitioners have failed to show that the balance of equities and public interest weigh in their favor. They make several broad statements concerning the severity of COVID-19 and its effect on Pennsylvanians: "COVID-19 is nothing more than a mild viral illness like the flu . . . [the Orders are] harming [the public's] immune systems by weakening it and making them more susceptible to contract viral illnesses. . .[and] COVID-19 poses a risk of serious harm or death to an infinitesimally small percentage of Pennsylvanians in certain demographic groups." (Doc. 3 at 12; Doc. 4 at 23). But Petitioners are not public health experts and provide no evidence to substantiate these claims. Indeed, Petitioners' arguments fly in the face of generally accepted principles regarding the nature of

COVID-19 and its transmission.[16] The Orders were instituted for the express purpose of protecting the public, and while we acknowledge that Petitioners have important financial equities at play in this case, they have failed to adduce evidence to prove that their losses outweigh the grave harms that could result to all Pennsylvanians from a widespread COVID-19 outbreak.

## IV.   CONCLUSION

This pandemic has presented impossible choices to government officials and private citizens alike, and we are not unmoved by the hardships Petitioners currently face. We recognize that Petitioners are hard-working individuals who rightly and earnestly desire to return to at least a semblance of their pre-COVID-19 lives. Nevertheless, we must also consider the circumstances that precipitated the Orders. Petitioners have failed to prove that the Governor violated constitutional strictures in their issuance. When faced with the real possibility that thousands of Pennsylvanians could lose their lives to COVID-19, the Governor took swift, reasonable action to prevent more widespread destruction—that the Pennsylvania death rate is not higher is a sign of the Orders' efficacy, not their irrelevance.

---

[16]     As of the date of this memorandum and order, there are 64,412 known cases of COVID-19 in Pennsylvania resulting in, as previously noted, at least 4,767 deaths. *Coronavirus (COVID-19): Pennsylvania Overview,* PENNSYLVANIA DEPARTMENT OF HEALTH, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last accessed May 21, 2020).  Petitioners' assertion that this is not a pandemic or public health crisis is so patently absurd that it undercuts virtually every facet of their various claims.

It is not the place of this Court to question the reasonable motives of elected officials, nor can we grant Petitioners' Motion based largely upon their political disagreements with the same.[17] This Court will not micromanage public policy in the midst of a pandemic. While there is ample basis for pandemic-weary Pennsylvanians to disagree about the means being instituted to fight COVID-19, there is no legal basis for us to enjoin them at this time.

Based on the foregoing, we shall deny the requested temporary restraining order.

**NOW, THEREFORE, IT IS HEREBY ORDERED THAT:**

1. The Petitioners' Motion for Temporary Restraining Order, (Doc. 3), is **DENIED**.

s/ John E. Jones III
John E. Jones III
United States District Judge

---

[17]     Petitioners filings are replete with high-blown, politically-charged rhetoric, including an argument that we should revert to a "Republican form of government." (Doc. 4 at 20). We are unsure what that argument represents in the context of Plaintiffs' Motion, but certainly recognize that it is not a cognizable legal argument before this Court. The Supreme Court of the United States has "several times concluded [] that the Guarantee Clause does not provide the basis for a justiciable claim." *Rucho v. Common Cause*, 139 S. Ct. 2484, 2506 (2019) (citing *Pacific States Telephone & Telegraph Co. v. Oregon*, 223 U.S. 118 (1912)); see also *Risser v. Thompson*, 930 F.2d 549, 552 (7th Cir. 1991). The claims are "not cognizable by the judicial power, but solely committed by the Constitution to the judgment of Congress." *Pac. States Tel. & Tel. Co.*, 223 U.S. 118.