TIN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ADRIAN MOODY and ROBIN JONES | : | CIVIL ACTION |
| d/b/a/ MOODY JONES GALLERY | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 20-2856 |
| | : | |
| THE HARTFORD FINANCIAL | : | |
| GROUP, INC. and TWIN CITY FIRE | : | |
| INSURANCE CO. | : | |
| *Defendants.* | : | |

## MEMORANDUM

Adrian Moody and Robin Jones, doing business as Moody Jones Gallery ("Moody Jones"), shut the doors of their art gallery to customers on March 16, 2020, because of the COVID-19 pandemic and associated government orders addressing the pandemic. Moody Jones sought indemnity from its insurance carrier, Twin City Fire Insurance Company ("Twin City") under its all-risk commercial property policy ("Policy").[1] Twin City denied the claim, and Moody Jones filed the instant lawsuit seeking a declaratory judgment that its losses are covered.

## I.    BACKGROUND[2]

---

[1] Moody Jones's original Complaint included The Hartford Financial Services Group as a defendant, but that entity was voluntarily dismissed pursuant to Fed. R. Civ. P. 41(a)(1). The Amended Complaint includes only Twin City as a defendant.

[2] The Court "accept[s] as true all allegations in plaintiff's complaint as well as all reasonable inferences that can be drawn from them, and construe[] them in a light most favorable to the non-movant." *Tatis v. Allied Interstate, LLC*, 882 F.3d 422, 426 (3d Cir. 2018) (quoting *Sheridan v. NGK Metals Corp.*, 609 F.3d 239, 262 n.27 (3d Cir. 2010)). The Court draws the following facts from the Amended Complaint, the insurance policy that is the basis for the plaintiff's claims, and the government orders the parties reference in their pleadings and have filed as supplements to the record. *See Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010). The Court includes Moody Jones's well-pleaded factual allegations as they pertain to the discussion but notes many of the allegations in the complaint are either legal assertions or conclusory statements. Such allegations

Moody Jones is an art gallery in Montgomery County, Pennsylvania. *See* 20-2856, ECF No. 10 ("Compl.) ¶ 9. Twin City, an insurance carrier headquartered in Indianapolis, Indiana, issued an insurance policy to Moody Jones for the period of December 10, 2019, to December 10, 2020. *Id.* ¶¶ 9-10. The Policy provided property, business personal property, business income and extra expense coverages, and civil authority coverage, amongst other provisions.[3] *Id.* ¶ 14. Moody Jones seeks to recover for losses it incurred when it closed the art gallery "[i]n light of the Coronavirus global pandemic and state and local orders mandating that all non-essential in store businesses must shut down." *Id.* ¶ 2.

According to the Complaint, COVID-19 is omnipresent, impacting the environment and leading to the government orders to protect businesses and people from COVID-19. ¶ 44. The virus that causes COVID-19 remains stable and transmittable in the air for up to three hours, and on various surfaces for hours to multiple days. *Id.* ¶ 48-53. The virus is thought to spread mainly from person-to-person, though the CDC has noted it may be possible to become infected by touching contaminated surfaces. *Id.* ¶ 55. Contamination of Moody Jones's property by the virus would require remediation to clean the surfaces of the offices and retail store. *Id.* ¶ 47. In businesses such as Moody Jones, there is a heightened risk of its property being contaminated. *Id.* ¶ 73. Moody Jones also alleges that its property *is* contaminated by COVID-19. *Id.* ¶ 81.

On March 6, 2020, Pennsylvania Governor Wolf issued a Proclamation of Disaster Emergency. *Id.* ¶ 62. The City of Philadelphia first issued restrictions on the operations of non-essential businesses to mitigate the spread of COVID-19 on March 16, 2020. *Id.* ¶ 62. The City

---

are generally not included here except as necessary for context. *See Connelly v. Lane Const. Corp.*, 809 F.3d 780, 789-90 (3d Cir. 2016).

[3] Twin City attached the Policy in full as an exhibit to its motion papers. *See* ECF No. 11-2, Ex. A. Citations to the Policy are to the Policy attached to Twin City's Motion to Dismiss (see *id.*).

of Philadelphia and Governor Wolf issued subsequent orders (collectively "government orders") requiring all non-essential businesses – like Moody Jones – to close. *Id.* ¶ 63-65.  Pennsylvania also issued stay-at-home orders to residents. *Id.* ¶ 65-66.  On June 5, 2020, Philadelphia permitted businesses like Moody Jones to gradually reopen provided they follow certain protocols. *Id.* ¶ 67.  Compliance with the CDC recommendations and the government orders "effectively made it impossible for Plaintiff to operate its business in the usual and customary manner," which caused its business losses and added expenses. *Id.* ¶ 58.

Moody Jones filed this action seeking a declaration that its business losses were covered. *Id.* Twin City filed a Motion to Dismiss.  ECF No. 11.  Moody Jones responded, ECF No. 12, and Twin City replied, ECF No. 13.  Twin City's motion is now ripe for the Court's review.[4]

## II.     STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(6) challenges the sufficiency of a complaint. To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Zuber v. Boscov's*, 871 F.3d 255, 258 (3d Cir. 2017) (quoting *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010)) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)); *see also Twombly*, 550 U.S. 544, 558 (2007) (requiring "some specificity in pleading before allowing a potentially massive factual controversy to proceed") (quoting *Associated Gen. Contractors of Cal., Inc. v. Carpenters*, 459 U.S. 519, 528, n.17 (1983)).

---

[4] This Court has jurisdiction pursuant to 28 U.S.C. § 1332, because Moody Jones and Twin City are diverse and the amount in controversy is over $75,000.

The Court must conduct a three-step analysis when presented with a 12(b)(6) motion. First, it must "tak[e] note of the elements [the] plaintiff must plead to state a claim." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 675) (alterations in original). "Second, it should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* (quoting *id.* at 679) (internal quotation marks omitted). Third, if "there are well-pleaded factual allegations, [the] court should assume their veracity and then determine whether they plausibly give rise to an entitlement of relief." *Id.* (quoting *id.*).

## III.   DISCUSSION

### a.  Legal Framework

The issue before the Court is one of contract interpretation. Under Pennsylvania law, which the parties agree applies to this case, "[c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement." *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (quoting *Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped*, 886 A.2d 706, 711 (Pa. Cmwlth. Ct. 2005)).

The Court's analysis begins with whether a provision in the insurance policy is ambiguous. When insurance policy language is "clear and unambiguous," a court applying Pennsylvania law must "give effect to that language." *401 Fourth Street v. Inv'rs Ins. Co.*, 879 A.2d 166, 170 (Pa. 2005).  "Alternatively, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897

(Pa. 2006) (quoting *401 Fourth St.*, 879 A.2d at 170) (internal quotation marks omitted).[5]  A policy is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense."  *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) (quoting *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (1986)).

Under Pennsylvania law, "ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts."  *Id.* at 607.  The "proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured."  *Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998).  Under Pennsylvania law, even if the terms of the insurance contract are clear and unambiguous, the insured's reasonable expectations may prevail over the express terms of the contract in certain circumstances.  *See Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994).  Nonetheless, the language of the insurance contract itself serves as the best evidence of the parties' reasonable expectations.  *See Safe Auto Ins. Co. v. Berlin*, 991 A.2d 327, 332 (Pa. Super. Ct. 2010).

The insured party bears the burden to "make a prima facie showing that a claim falls within the policy's grant of coverage."  *State Farm Cas. Co. v. Estate of Mehlman*, 598 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law).  Once that burden is met, the insurance company "bears the burden of proving the applicability of any exclusions or limitations on

---

[5] Because the policy at issue was drafted by one party and only signed by the other, it is also an adhesion contract. Under the doctrine of *contra proferentem*, "any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable."  *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) ((citing *Sun Co. v. Pa. Tpk. Comm'n*, 708 A.2d 875, 878-79 (Pa. Commw. Ct. 1998) (citing Restatement (Second) of Contracts § 206))).

coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law).

### b. Policy

Moody Jones asserts its losses are covered under the Policy. Its all-risk policy protects against "direct physical loss of or physical damage to Covered Property at the premises described . . . caused by or resulting from a covered Cause of Loss." Policy, ECF No. 11, Ex. A, at 31. "Covered Cause of Loss" is defined as "risks of direct physical loss unless the loss is Excluded . . . or Limited. . ." *Id.* at 32.

The Business Income coverage provision covers certain losses of business income caused by direct physical loss of or damage to the covered property. It provides in part that Twin City:

> will pay for the actual loss of Business Income [the insured] sustain[s] due to the necessary suspension of [its] "operations" during the "period of restoration". The suspension must be caused by direct physical loss of or physical damage to property at the "scheduled premises", including personal property in the open (or in a vehicle) within 1,000 feet of the "scheduled premises", caused by or resulting from a Covered Cause of Loss.

*Id.* at 40. The Policy defines "suspension" as "[t]he partial slowdown or complete cessation of your business activities" or that part or all of the "scheduled premises" is "rendered untenantable as a result of a Covered Cause of Loss." *Id.* "Operations" means the business activities "occurring at the 'scheduled premises' and tenantability of the 'scheduled premises.'" *Id.* at 54. The "period of restoration" is defined as the time that (a) "begins with the date of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss at the 'scheduled premises' and "[e]nds on the date when:" (1) "[t]he property at the 'scheduled premises' should be repaired, rebuilt, or replaced with reasonable speed and similar quality; (2) [t]he "date when [the insured's] business is resumed at a new permanent location." *Id.*

Under the Policy's Extra Expense coverage, Twin City agreed to pay for "reasonable and necessary Extra Expense [the insured] incur[s] during the 'period of restoration' that [it] would not have incurred if there had been no direct physical loss or physical damage to property at the 'scheduled premises' . . . caused by or resulting from a Covered Cause of Loss." *Id.* "Extra Expense" means expenses incurred to:

> (a) avoid or minimize the suspension of business and to continue 'operations'; . . . (b) [t]o minimize the suspension of business if [the insured] cannot continue 'operations'; [or] (c)(i) [t]o repair or replace any property; or (ii) [t]o research, replace or restore the lost information on damaged . . . papers and records.

*Id.* at 40-41.

Separately, the Policy includes additional Civil Authority Coverage, which extends coverage to "actual loss of Business Income [the insured] sustain[s] when access to [its] 'scheduled premises' is specifically prohibited by order of a civil authority as the direct result of a Covered Cause of Loss to property in the immediate area of [its] 'scheduled premises.'" *Id.* at 41. This coverage begins 72 hours after the order of a civil authority and ends at the earlier of "[w]hen access is permitted" or "30 consecutive days after the order of the civil authority." *Id.*

Finally, the Policy includes a "fungi, wet rot, dry rot, bacteria and virus" exclusion that Twin City argues precludes coverage even if Moody Jones could establish prima facie coverage.

### c. Prima Facie Coverage

Under Pennsylvania law, the Court first determines whether Moody Jones has met its burden of establishing coverage under the Policy's affirmative coverage grant. *See State Farm*, 598 F.3d at 111. The Policy provisions that Moody Jones invokes share certain essential elements. Business Income coverage is tied to "direct physical loss of or physical damage to" insured property, and Extra Expense coverage is triggered by costs that "would not have incurred if there had been no direct physical loss or physical damage" to insured property. ECF No. 11,

Ex. A at 40-41.  Each coverage also depends on there being a Covered Cause of Loss.  The Business Income and Extra Expense coverages apply when direct physical loss or damage is caused by a "Covered Cause of Loss."  Additionally, the Civil Authority Coverage applies when an action of civil authority prohibits access to the insured premises as a direct result of a Covered Cause of Loss to property in the immediate area of the insured property.  *Id.* at 41.

In its motion to dismiss, Twin City argues that Moody Jones has not and cannot show its claim falls within the Policy's grant of coverage.  Moody Jones responds that it has sufficiently alleged facts that trigger coverage or at minimum allow it to proceed past the motion to dismiss stage to discovery.

### 1.  Business Income and Extra Expense Coverage

For Moody Jones to state a prima facie claim of coverage under the Business Income or Extra Expense provisions, it must show it has suffered "direct physical loss of or physical damage to" its property.  The parties dispute the meaning of that phrase.  Moody Jones contends that "direct physical loss of . . . property" is not limited to physical alteration of the property but includes lost operations or inability to use its business.  *See* Pl. Br. in Opp. at 28-35.  Because Twin City failed to define "direct physical loss of or physical damage to" in its Policy, Moody Jones argues that its reasonable interpretation must govern.  Twin City argues that Moody Jones has alleged no direct physical loss or damage to its property and that government orders are not a covered cause of loss.  *See* Mot. to Dismiss at 18-21, 12-15.

Third Circuit precedent is on point and instructive here.  In *Port Authority of New York and New Jersey*, the Circuit addressed whether the presence of asbestos in a building constituted "direct physical loss or damage" under New Jersey law.  *Port Auth. of N.Y. & N.J. v. Affiliated MF Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002).  The Court explained that "[i]n ordinary parlance

and widely accepted definition, physical damage to property means distinct, demonstrable, and physical alteration of its structure." *Id.* (quoting 10 Couch on Ins. § 148:46 (3d ed. 1998)). But damage by sources unnoticeable to the naked eye must "meet a higher threshold" than "typical examples of physical damage from an outside source that may demonstrably alter the components of a building." *Id.* at 235. Recognizing that the policy at hand also covered "physical loss," the Court concluded that the "proper standard for 'physical loss or damage' is one that triggers coverage:

> only if an actual release of asbestos fibers from asbestos containing materials has resulted in contamination of the property such that its *function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable,* or if there exists an *imminent threat* of the release of a quantity of asbestos fibers that would cause such *loss of utility*.

*Id.* at 236 (emphasis added). The criteria for 'physical loss' caused by a source "unnoticeable to the naked eye" is thus "whether the functionality of the . . . property was nearly eliminated or destroyed, or whether the[] property was made useless or uninhabitable" by that source. *Id.* The "mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage." *Id.* This test is consistent with Pennsylvania law. *See Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826 (3d Cir. 2005) (finding an issue of material fact existed under Pennsylvania law as to whether a house's functionality was nearly eliminated or destroyed, or made useless or uninhabitable, by the presence of e coli in a well).

Thus, "under Pennsylvania law, for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's 'physical loss' provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of the premises." *4431, Inc. et al v. Cincinnati Ins. Cos*., No. 5:20-cv-04396, 2020 WL 7075318, at *11 (E.D. Pa. Dec. 3, 2020) (emphasis in original).

There must also be an "element correlating to [the] extent of operational utility – *i.e.,* a premises must be uninhabitable and unusable, or nearly as such." *Id; see also Brian Handel D.M.D. v. Allstate Ins. Co.*, No. 20-3198, 2020 WL 6545893 (E.D. Pa. Nov. 6, 2020) (finding *Port Authority* and *Hardinger* preclude a finding of "direct physical loss of or damage to" property where it remained inhabitable and usable, albeit in limited ways).[6]  In sum, while structural damage is not required to show "direct physical loss of" property, the source that destroys the property's utility must have something to do with the physical condition of the premises.

And so, the Court looks to Moody Jones's complaint to determine whether well-pleaded facts show alleged losses that "bear some causal connection to the physical condition of the premises" and whether those conditions "operate[d] to completely or near completely preclude operation of the premises as intended." *4431, Inc.*, 2020 WL 7075318, at *10.  Moody Jones alleges that it has experienced a covered loss by virtue of government orders that resulted in "access to Plaintiff's insured Property [being] no longer available and its business suspended from its intended operations."  ¶ 76.  The Complaint alleges that Moody Jones's losses were "not directly caused by a virus" but were rather "caused by the entry of Civil Authority Order . . . to mitigate the spread of COVID-19."  ¶ 42.  Later in the complaint, Moody Jones makes contradictory allegations, claiming that "Plaintiff's property is contaminated by COVID-19" and that the "virus is physically impacting" its property and is damaged by it.  ¶ 81.  Finally, Moody Jones also alleges that its property is at risk of contamination by the virus.  ¶ 73.

---

[6] Moody Jones cites a plethora of cases from across the country finding covered loss, almost exclusively when something physical affects the physical condition of the property.  To the extent that those cases align with the Third Circuit's reasoning in *Port Authority* and *Hardinger*, the Court considers them.

To the extent that Moody Jones alleges that its "direct physical loss of or damage to" its property is the inability to use the property as intended because of the government closure orders, those losses do not bear a causal connection to the physical condition of its premises.  Rather, Moody Jones is alleging that mere loss of use untethered to the physical condition of its property suffices.  This reading contradicts *Port Authority*'s holding and is unreasonable because it would render two other Policy provisions superfluous or nonsensical.

First, it would create discord between the business income and extra expense provisions on one hand and the Civil Authority coverage endorsement on the other.  If mere inability to use a property or inability to use it for its intended purpose is a "direct physical loss," then a government order barring access to a property would itself trigger business income or extra expense coverage because that lack of access would mean that the business could not use the property and was therefore suffering direct physical loss or damage.  In that case, there would be no need for a separate Civil Authority provision granting coverage when civil authority orders bar access to premises under more limited circumstances.[7]

Second, Moody Jones's reading does not make sense in relation to the "period of restoration" language.  Business Income and Extra Expense coverage is only provided during the period of restoration, defined in part as the time that begins "with the date of direct physical loss or physical damage caused by or resulting from a Covered Cause of Loss" and ends on the date when "[t]he property . . . should be repaired, rebuilt, or replaced with reasonable speed and similar quality" or the "date when . . . business is resumed at a new permanent location."  Built

---

[7] Said another way, a civil authority order cannot itself be a "Covered Cause of "Loss" that causes loss of or damage to Moody Jones's property if the same order is required to be "the direct result of a Covered Cause of Loss" for purposes of Civil Authority coverage.  ECF No. 11, Ex. A at 41.

into coverage for business income, extra expense, or extended business income losses under the Policy, then, is the idea that there is something to repair, rebuild, or replace – none of which exists for mere loss of use untethered to a physical condition of the property.  *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) ("The words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it.").  Accordingly, Moody Jones's theory that its loss of use or lost operations stemming from the government order is a covered loss under the Business Income and Extra Expense provisions fails.

Moody Jones separately alleges that the virus *is* on its property and has been damaged by it.  Compl. ¶ 81.  Setting aside the fact that this allegation contradicts its argument that its losses were caused only by the government orders, it also fails to plausibly allege direct physical loss or damage.  Neither the presence of the virus nor an imminent threat thereof – also separately alleged by Moody Jones – has "nearly eliminated or destroyed" the property's functionality or rendered it "useless or uninhabitable."  *Hardinger*, 131 F. App'x at 826-27.  Rather, Moody Jones's gallery was allowed to gradually reopen when Philadelphia entered a new stage for business access under the government's orders.  Compl. ¶ 67.  The fact that Moody Jones began reopening, albeit with mitigation measures to protect public health, once certain government restrictions lifted demonstrates that the government orders addressing the virus rather than the virus itself was the source seriously affecting the property's functionality.  Further, by Moody's admission, contamination by the virus would only require "remediation to clean the surfaces of the offices and retail store constituting the Insured Property."  *Id.* ¶ 47.  Because surfaces would merely need to be cleaned, contamination would not meet the requirements under *Port Authority* because presence of the virus would not render the property useless or uninhabitable or nearly

eliminate or destroy its  functionality.  Nor would coverage for actual or threatened coronavirus contamination make sense in connection with the period of restoration, because cleaning surfaces cannot reasonably be described as repairing, rebuilding, or replacing.

Thus, none of Moody Jones's theories for the physical loss of or damage to its property it allegedly suffered suffice to plausibly plead covered losses.  Moody Jones requests discovery on "whether there exists physical loss or damage, the mechanism by which the coronavirus and COVID-19 cause property damage and illness, the infectiousness and health risks of COVID-19, [and] the expense that is necessary for remediation."  Pl. Br. in Opp. at 17.  In particular, it claims that expert testimony is necessary to demonstrate the property damage "[b]ecause of the nature of the coronavirus."  *Id.*  But any facts learned through that process would not rescue Moody Jones's claim from its legal deficiencies based on the plain language of its Policy and applicable Third Circuit law.

To the extent Moody Jones argues that the Court should hold that its losses are covered regardless of the language of the Policy because they "reasonably expected" them to be covered, those arguments are unavailing.  Moody Jones alleges that it "purchased the Policy with an expectation that it was purchasing a policy that would provide coverage in the event of business interruption," and that Twin City at no time notified Moody Jones that it had purchased a Policy that had "exclusions and provisions that purportedly undermined the very purpose of the coverage, of providing benefits in the occurrence of business interruption and incurring extended expenses."  Compl. ¶¶ 35-36.  It further alleges that Moody Jones "specifically sought coverage for business interruption losses and extra expenses and paid premiums for such coverage . . . with no disclosures to the contrary being made to Plaintiff by Defendant or its agents."  *Id.* ¶ 86.

But Moody Jones has not pleaded facts that lead the Court to conclude that Twin City or its agent "create[d] in the insured a reasonable expectation of coverage that is not supported by the terms of the policy." *Bensalem Twp.*, 38 F.3d at 1311.  The Court looks to the totality of the insurance transaction to ascertain the reasonable expectation of the insured.  *See Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 440 (3d Cir. 2006) (*quoting Liberty Mut. Ins. Co. v. Treesdale, Inc.,* 418 F.3d 330, 344 (3d Cir.2005)).  The Policy is fundamentally a property insurance policy.  The "Special Property Coverage Form" states that Twin City "will pay for direct physical loss of or physical damage to *Covered Property*."  ECF No. 11, Ex. A at 31 (emphasis added).  The Policy's Business Income coverage is an extension of that property insurance to situations where already covered loss or damage causes a suspension of business activity.  Moody Jones has pleaded no facts that lead the Court to believe it *reasonably* expected business losses not tied to any kind of actual damage to property would be covered by a property insurance policy.  *See Tonkovik v. State Farm Mut. Auto. Ins. Co.*, 521 A.2d 920, 923 (Pa. 1987) (finding it "patently unreasonable" for an insured to believe that the general liability coverage he purchased covered one's own property).

To be sure, Moody Jones alleges that it sought coverage for business interruption losses and that Twin City did not disclose that its policy excluded those losses.  But Moody Jones fails to assert any *change* in the policy they actually applied for and paid for that they were unaware of which would justify setting aside the plain language. *See Bensalem Twp.*, 38 F.3d at 1312 (stating that "the insurer may not unilaterally change the coverage provided without an affirmative showing that the insured was notified of, and understood, the change") (internal citation omitted)); *see also Tonkovik*, 521 A.2d at 925 (finding that when an individual "applies and prepays for specific insurance coverage, the insurer may not unilaterally" change it).  Again,

the policy that Moody Jones purchased is fundamentally a business owner's property insurance policy.  While Moody Jones alleges that it *sought* coverage for business interruption losses, it points to no facts that it actually applied and paid for a wholly different kind of policy than what it received.  Nor does it allege any affirmative representation by Twin City or its agents that business losses untethered to property loss or damage would be covered that could constitute a reason to set aside the unambiguous language of the property insurance policy here.  *See Rempel v. Nationwide Life Ins. Co.*, 371 A.2d 366 (Pa. 1977) ("It is therefore not unreasonable for consumers to rely on the representations of the expert rather than on the contents of the insurance policy itself.")).

## 2.   Civil Authority Coverage

For the Policy's Civil Authority Coverage to apply, there must be a (1) "specific[] prohibit[ion] of access to" Moody Jones's premises, (2) a Covered Cause of Loss to property in the immediate area" of Moody Jones's premises, and (3) the order specifically prohibiting access to Moody Jones's premises must be a direct result of that covered cause of loss.  Twin City argues that Moody Jones failed to allege that it could not access its premises, failed to allege any harm to any other property, and failed to plausibly allege the causation element.  Moody Jones responds that the Orders bar the public from the premises, that COVID-19 losses and the risk of injury is a covered cause of loss, and that it did allege the causation element.  The Court agrees with Twin City that Moody Jones has failed to plausibly allege prima facie coverage under the Civil Authority provision.

Moody Jones must plausibly plead that there was a "Covered Cause of Loss" to nearby property that directly resulted in the government order specifically prohibiting access to Moody Jones's premises.  ECF No. 11, Ex. A at 41.  The parties agree that this provision requires the

Orders to be issued in response to loss or damage to nearby property.  *See* ECF No. 11, Mot. to Dismiss at 22-23; *see also* Pl. Br. in Opp., ECF No. 12 at 21.  Moody Jones argues that it meets this requirement because it "indisputably alleges that at the time of the entry of the Orders, the spread of COVID-19 was already underway and constituted losses to the area in and around" its premises.  *Id.* at 21.  In this way, Moody Jones attempts to counter Twin City's argument that courts routinely reject civil authority claims aimed at future harm.

The Court agrees that the orders were issued to respond to COVID-19.  But as Moody Jones itself also alleges, these orders were issued "to mitigate health risks to the public by attempting to prevent COVID-19 contamination."  Compl. ¶ 85.  *See also, e.g.*, "Proclamation of Disaster Emergency, Governor Wolf, Commonwealth of Pennsylvania (March 6, 2020) (stating that it is critical "to implement measures to mitigate the spread of COVID-19"); *Friends of Danny Devito v. Wolf*, 227 A.2d 872, 889-90 (Pa. 2020) (explaining the governor's orders were executed "to protect the lives and health of millions of Pennsylvania citizens").  These orders were issued to address the ongoing health crisis and the reality of people spreading COVID-19 to other people, not as a direct result of some "direct physical loss."  Nor does COVID-19 contamination or the threat thereof constitute "risks of direct physical loss" because properties are not rendered uninhabitable or unusable due to a physical condition of the property caused by COVID-19.  *4431, Inc.*, 2020 WL 7075318, at *10.  Accordingly, Moody Jones cannot satisfy the requirements for coverage premised on an order issued as a "direct result of a Covered Cause of Loss" to property in the immediate area.  That the government orders themselves caused income loss by depriving Moody Jones of the use of their properties for their business is an unfortunate effect of the COVID-19 pandemic, but it is a loss not covered under a plain reading of the Civil Authority Coverage provision of its contract.

### 3.  No Prima Facie Coverage

The Court recognizes that courts in other jurisdictions have either found coverage under similar policies or allowed cases to survive motions to dismiss.  But upon review of those non-binding cases, Moody Jones's Policy, and relevant caselaw from the Third Circuit, the Court finds that Moody Jones has not met its burden to plausibly allege coverage under its policy and cannot do so given the nature of its losses.

### d.  Virus Exclusion

Even if Moody Jones had plausibly alleged its losses qualified for Business Income, Extra Expense, or Civil Authority Coverage, the Virus Exclusion precludes coverage.  The Virus Exclusion provides that Twin City "will not pay for loss or damage caused directly or indirectly by . . . Presence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus."  ECF No. 11, Ex. A at 126.  But if "'fungi', wet rot, dry rot, bacteria or virus results in a 'specified cause of loss' to Covered Property," Twin City "will pay for the loss or damage caused by that 'specified cause of loss.'"  *Id.*  The exclusion applies "regardless of any other cause or event that contributes concurrently or in any sequence to the loss" and "whether or not the loss event results in widespread damage or affects a substantial area."  *Id.*  Twin City argues this exclusion unambiguously precludes coverage for Moody Jones's losses, which were ultimately caused by the existence of the coronavirus.  Moody Jones responds that the Virus Exclusion does not apply and is ambiguous, that the doctrine of regulatory estoppel precludes Twin City from asserting the virus exclusion, and that, at a minimum, its regulatory estoppel argument and applicability of the virus exclusion warrant discovery.

### 1.  Applicability of the Virus Exclusion

Moody Jones claims that the Virus Exclusion does not apply because the government closure orders, not the virus, was the cause of its losses.  Disregarding the fact that Moody Jones separately alleged that the virus was on its property and damaged it, Compl. ¶ 81, its losses stemming from the government orders still do not escape the applicability of the Virus Exclusion.  By the terms of the Policy, the virus need only be one cause of loss, not the sole or proximate cause of loss, for the exclusion to bar coverage.  *See* ECF No. 11 Ex. A at 126.  Moody Jones acknowledges that the coronavirus is a virus.  *Id.* ¶ 48.  Whether or not Moody Jones alleged that the virus was at its property is immaterial because nothing in the exclusion limits its applicability to situations where a virus is on the covered property.  Instead, the virus exclusion applies because Moody Jones alleged that its losses stem from the Closure Orders, and those closure orders were designed to prevent exposure to COVID-19 and the spread of the virus.  Those orders would not have been issued but for the "[p]resence, growth, proliferation, [or] spread" of the coronavirus.  Even if the virus was not the direct cause of its losses, it was at least an indirect cause, which is sufficient to bar coverage under the Virus Exclusion clause.

Moody Jones also argues that the Virus Exclusion does not bar coverage because it is ambiguous and discovery is needed to ascertain the intent of the exclusion.  A sister court recently held a virus exclusion identical to this Policy's to be unambiguous in the context of losses caused by the coronavirus.  *See Wilson v. Hartford Cas. Co.*, No. 20-cv-3384, 2020 WL 5820800, at *7 (E.D. Pa. Sept. 30, 2020) ("[Insurer] will not pay for loss or damage caused directly or indirectly by . . . [p]resence, growth, proliferation, spread or any activity of 'fungi', wet rot, dry rot, bacteria or virus.").  Exclusions are "effective against an insured if they are clearly worded and conspicuously displayed, irrespective of whether the insured read the limitations or understood their import."  *Frederick Mut. Ins. Co. v. Ahatov*, 274 F. Supp. 3d 273,

283 (E.D. Pa. 2017).  Just as in *Wilson*, where Judge Robreno found an identical virus exclusion unambiguous, "the Policy language here . . . is conspicuously displayed, clear, and unambiguous."  2020 WL 5820800, at *7.  The coronavirus is a virus, and the Policy explicitly excludes losses caused directly or indirectly by viruses.

Moody Jones argues that the provision is ambiguous because it has pleaded that the government orders causes its losses rather than a virus.  This allegation, contradicted by other allegations in its complaint, does not render the exclusion ambiguous because the anti-concurrent-clause language unambiguously dictates that the virus exclusion applies even if a virus is not the sole or proximate cause of loss.  *See Heller's Gas, Inc. v. Int'l Ins. Co. of Hannover Ltd.*, No. 15-1350, 2017 WL 4119808, at *12-13 (M.D. Pa. Sept. 18, 2017) ("The explicit inclusion of this [anti-concurrent causation] language negates the default 'efficient proximate cause' doctrine under Pennsylvania law.").  The Virus Exclusion applies to the Civil Authority coverage provision.  *See* ECF No. 11 Ex. A at 126 (noting the virus exclusion is added to "Paragraph B.1, . . . Special Property Coverage Form"); *see also id.* at 41 (listing Civil Authority coverage within the Special Property Coverage Form).  And in any event, Moody Jones's losses caused by government order are not covered within the affirmative grant of coverage.  *See, supra.*

Moody Jones also argues that the Virus Exclusion does not preclude coverage because it does not mention a pandemic situation or damages incurred as a result of a pandemic.  The coronavirus outbreak is undoubtedly a pandemic.  Compl. ¶ 50.  But the Virus Exclusion specifically notes that it applies "whether or not the loss event results in widespread damage or affects a substantial area."  ECF No. 11 Ex. A at 126.  A virus spreading around the world, which was then classified as a pandemic, fits squarely within the plain language of the exclusion.

19

Moody Jones attempts to bolster its argument by citing exclusions in other policies that preclude coverage for "actual or suspected presence or threat of any virus . . . capable of inducing disease . . . including but not limited to any epidemic, [or] pandemic . . ." *See* Pl. Br. in Opp. at 12 (citing *Myer Nat. Foods, LLC v. Liberty Mut. Fire Ins. Co.*, 218 F. Supp. 3d 1034, 1038 (D. Neb. 2016)). But exclusions included in other policies are not at issue, and Moody Jones's losses caused by a widespread virus are precluded under its Policy.

Moody Jones presents various arguments for why it should be allowed discovery on the virus exclusion. It argues that "[m]aterial and complex factual issues" exist, including the "validity, purpose, and scope of the Virus Exclusion," whether the inclusion of that exclusion in the Policy resulted in a decrease in premiums or alternatively unjustly enriched Twin City, and how it was drafted and should be interpreted. Pl. Br. in Opp. at 11, 13. But when insurance policy language is "clear and unambiguous," a court applying Pennsylvania law must "give effect to that language." *401 Fourth Street*, 879 A.2d at 170. While it is true, as Moody Jones argues, that ambiguity is not to be resolved in a vacuum, the "particular set of facts" that the Court must consider to determine whether the language is ambiguous is Moody Jones's alleged losses. *See Madison*, 735 A.2d at 106. Even if the virus exclusion were ambiguous, which it is not, no amount of discovery on the facts alleged would allow Moody Jones to escape the applicability of the plain language of the Virus Exclusion. And even if it could, that discovery would not alter the fact that Moody Jones has not and cannot state a claim for relief under the Policy's affirmative grant of coverage.

### 2. Regulatory Estoppel

Moody Jones separately argues that Twin City should be estopped from relying on the Virus Exclusion to deny coverage because the Virus Exclusion was fraudulently adopted.

Without relying on any alleged facts, Moody Jones asserts that a *potential* regulatory estoppel argument merits discovery and renders dismissal at this stage inappropriate.  The Court disagrees.

The Court's responsibility at this stage is to determine whether Moody Jones's complaint can survive Twin City's motion to dismiss by alleging sufficient factual matter, accepted as true, to state a plausible claim to relief.  *Zuber*, 871 F.3d at 258 (quotation omitted).  Regulatory estoppel "prohibits parties from switching legal positions to suit their own ends."  *Sunbeam Corp. v. Liberty Mut. Ins. Co.*, 781 A.2d 1189, 1192 (Pa. 2001).  If an insurer represented to a regulatory agency that new language in a policy would not result in decreased coverage, the insurer cannot assert the opposite position when insureds raise the issue in litigation.  *Hussey Copper, Ltd. v. Arrowwood Indem. Co.*, 391 F. App'x 207, 211 (3d Cir. 2010).  To plead a claim for regulatory estoppel, Moody Jones must allege (1) that Twin City made a statement to a regulatory agency and (2) that Twin City later adopted a position contrary to the one presented to the regulatory agency.  *See Simon Wrecking Co. v. AIU Ins. Co.*, 541 F. Supp.2d 714, 717 (E.D. Pa. 2008).  But it has failed to sufficiently allege either element.

Moody Jones alleges that, on information and belief, the Virus Exclusion was first permitted by state insurance departments "due to misleading and fraudulent statements by the ISO that property insurance policies do not and were not intended to cover losses caused by viruses, and so the Virus Exclusion offers mere clarification of existing law."  Compl. ¶ 27.  It alleges that this position was fraudulent and misleading because, "before the ISO made such baseless assertions, courts considered contamination by a virus to be physical damage."  *Id.*  And it further alleges that the Virus Exclusion was improperly added to policies by insurance carriers

to expand the exclusions of coverage in their policies without disclosing to regulators that the provision was reducing coverage.  *Id.* ¶ 28.

These allegations do not plausibly plead the first element.  Moody Jones argues that its allegations that the ISO made fraudulent statements to state regulators suffices.  But the Complaint does not allege that Twin City itself made any specific statements or that the ISO presented on Twin City's behalf.  *Compare Handel*, 2020 WL 6545893, at *4 (finding that plaintiff satisfied the first element where it averred that an insurer's agent presented to state regulatory agencies in 2006 on behalf of multiple insurers, *including defendant*, to include a virus exclusion in insurance policies) *with* Compl. ¶ 27 (alleging fraudulent statements by the ISO and that Twin City used the Virus Exclusion).[8]  In its response brief, Moody Jones argues that it satisfies this requirement because Twin City was the intended beneficiary of the ISO's application and should therefore be estopped.  Pl. Br. in Opp. at 17.  But whether an insurer is the "intended beneficiary" of statements made to a regulator is not the test.  Because Moody Jones does not allege that Twin City made statements to a regulator or that the ISO did so on Twin City's behalf, it fails to meet the first element.[9]

---

[8] In its brief, Moody Jones states that "Defendant/the ISO" made statements to the regulatory agency.  Because its complaint does not state that Twin City made any statements to the regulators and because its brief also states that Twin City was the *intended beneficiary* of the ISO's statements, the Court understands Moody Jones's "Defendant/ISO" denomination to mean that the ISO made statements and Twin City was the intended beneficiary of them.

[9] Although the parties did not include a copy of the ISO's version of the Virus Exclusion for the Court to be able to verify, it appears that Twin City's policy uses its own form, created by Hartford, rather than the one created by the ISO.  *See* ECF No. 11, Ex. A at 126 (reflecting a Hartford copyright and a 2005 edition date).  If so, this would be another reason that the regulatory estoppel argument is inapplicable.  *See Hussey*, 391 F. App'x at 211 (rejecting a regulatory estoppel argument when the ISO made representations to insurance regulators pertaining to a different pollution exclusion provision in a different contract than the one at issue).  Moody Jones argues that Twin City "undoubtedly" used the ISO language as a template or adopted it verbatim.  The Court will not wade into this dispute because the regulatory estoppel argument otherwise fails.

Even if the ISO's alleged statements could be imputed to Twin City, and even if Twin City had used the ISO exclusion form, Moody Jones has not alleged that Twin City is now contradicting the statements that the ISO made to state regulatory bodies.  The ISO allegedly told regulators that "property insurance policies do not and were not intended to cover losses caused by viruses, and so the Virus Exclusion offers mere clarification of existing law."  Compl. ¶ 27. Twin City takes the same stance here by arguing that the Policy's virus exclusion precludes coverage for any damage or loss caused "directly or indirectly by . . . activity of . . . [a] virus," ECF No. 11, Ex. A at 126, and that the property insurance policy does not cover economic losses from viruses that do not cause direct physical loss of or damage to property under its affirmative grant of coverage.  Twin City's position in this litigation does not contradict a position that the ISO took, so the regulatory estoppel doctrine is inapplicable for this reason, as well.  *See Hussey*, 391 F. App'x at 211 (finding, in dicta, that when the ISO's statements "were not so contrary to" the position the insurer is now taking, regulatory estoppel is inapplicable).  Multiple courts have reached the same conclusion when presented with similar arguments.  *See Newchops Rest. Comcast LLC v. Admiral Indem. Co.,* No. 20-1869, 2020 WL 7395153, at *10 (E.D. Pa. Dec. 17, 2020); *Kessler v. Dentists' Ins. Co*., 2020 WL 7181057, at *3 (E.D. Pa. Dec. 7, 2020); *Handel,* 2020 WL 6545893, at *5.

Because Moody Jones has failed to plausibly allege either element of regulatory estoppel, its argument fails and the Virus Exclusion applies. Moody Jones argues that disposition at this stage is premature, and that it needs discovery of both Twin City and the ISO with respect to the potential regulatory estoppel defense.  But because Moody Jones did not allege that Twin City made any arguments to the regulators or that the ISO presented on Twin City's behalf, that discovery would be irrelevant; no matter what was said before the regulators, it would not be

imputed to Twin City. And even if that discovery were allowed and Moody Jones could somehow meet the elements for regulatory estoppel precluding the application of the virus exclusion, its claim would fail because Moody Jones has not and cannot demonstrate losses that fit within the Policy's affirmative grant of coverage as a matter of law.

### e.  Leave to Amend

Courts must grant plaintiffs leave to amend their complaint where justice so requires. Fed. R. Civ. P. 15(a)(2). But where leave to amend would be futile, denial of leave to amend is appropriate. *See Kanter v. Barella*, 489 F.3d 170, 181 (3d Cir. 2007). The Court will not grant Moody Jones leave to amend its complaint because it can allege no facts related to its Policy, its losses, or the reasons for its losses that could bring its claim within the coverage of its insurance policy.

### IV.  CONCLUSION

Because Moody Jones's losses are not covered by the Policy, the Court will grant Twin City's Motion to Dismiss and dismiss with prejudice Moody Jones's complaint seeking a declaration that its losses are covered.